Erica Beal
CEO/Managing Partner, AVIVV
258 Coach Lamp Ln.
Houston, TX  77060
619.517.8530
Ericalbeal@outlook.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY CAMDEN VICINAGE**

| | |
|---|---|
| JOSEPH JINGOLI & SONS, INC., | Civil Action No. 1:23-cv-21364 ESK EAP |
| Plaintiff & Counter-Defendant, | **DECLARATION OF ERICA L. BEAL IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD** |
| v. | |
| ERICA L. BEAL, | |
| Defendant & Counterclaimant | |

**DECLARATION OF ERICA L. BEAL IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD**

1. My name is Erica L. Beal, and I am over 18. I am the Counterclaimant, a military spouse, mother, entrepreneur, and founder of AVIVV, the first certified Military Spouse-Owned utility services business. I have personal knowledge of the facts herein and could testify if required.

2. On January 8, 2025, Arbitrator Paul A. Sandars, III, issued an Opinion and Decision recognizing duplicative claims filed across multiple venues by Jingoli and its affiliates, emphasizing the importance of resolving disputes consistently through arbitration.

3. The Arbitrator confirmed that the arbitration clause applies to disputes involving both signatories and non-signatories, affirming that the claims in this case are subject to arbitration.

4. The January 8, 2025, decision, along with the October 17, 2024, ruling, consistently affirms that these claims fall within the broad arbitration clause covering "any and all good faith differences and disputes of whatsoever nature arising out of this Agreement." (Exhibit D)

5. Joseph Jingoli & Son, Inc., the Plaintiff, has been named in the arbitration proceedings, underscoring their acknowledgment of arbitration as the proper forum.

6. Joseph Jingoli & Son, Inc. exerts significant control over AVIVV, including its financial operations.

7. For example, Joseph Jingoli, Michael Jingoli, and employees of Joseph Jingoli & Son, Inc. have blocked my access to AVIVV's financial accounts, restricted computer and phone access, trespassed on my home, and seized my company vehicle.

8. All AVIVV employee benefits, including health and workplace benefits, are controlled by

Joseph Jingoli & Son, Inc., further demonstrating their dominance.

9. Despite the Arbitrator's rulings, Plaintiff's counsel, Robert Zoller, sought a second reconsideration, which was denied. This highlights Plaintiff's ongoing attempts to bypass arbitration and litigate in multiple forums.

10. The actions of Joseph Jingoli & Son, Inc., compounded by Robert Zoller's conduct, have left me severely prejudiced in this case.

11. Mr. Zoller represents Joseph Jingoli & Son, Inc. while also serving as AVIVV's attorney in unrelated matters, including before the United States Patent and Trademark Office. This conflict of interest undermines my position and equitable treatment. Their coordinated actions—including blocking my access to financial systems and seizing resources—have significantly hindered my ability to manage my business and prepare for this case.

12. While Robert Zoller stated under penalty of perjury that no relationship exists between AVIVV, LLC, Joseph Jingoli & Son, Inc., and Jingoli Power LLC, correspondence dated December 22, 2023 (Exhibit B), and January 8, 2024 (Exhibit C), directly contradicts these claims. These letters from Joseph Jingoli, CEO of Joseph Jingoli & Son, Inc., further underscore the entities' interconnectedness.

13. As a pro se litigant, I have complied to the best of my ability with procedural rules and filed this motion to ensure the Court has a complete and accurate record, including the Arbitrator's January 8, 2025, Opinion and Decision.

14. Attached as Exhibit A is a true and correct copy of the Arbitrator's Opinion and Decision dated January 8, 2025.

15. Supplementing the record with the Arbitrator's decision will assist the Court in resolving the motion to compel arbitration and avoid inconsistent rulings.

DECLARATION OF ERICA L. BEAL IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD

Respectfully submitted,

Erica L. Beal

**Erica L. Beal**

Pro Se Defendant and Counterclaimant

258 Coach Lamp Lane

Houston, Texas 77060

Email: ericabeal@outlook.com

Phone: (619) 517-8530

Dated: January 15, 2025

DECLARATION OF ERICA L. BEAL IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD

# EXHIBIT A

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between

**Claim No. 01-23-0002-7129**

JINGOLI POWER, LLC,
    Claimant,

and

**PAUL A. SANDARS, III, Arbitrator**

ERICA L. BEAL,

    Respondent.

---

## ARBITRATOR'S OPINION AND DECISION ON CLAIMANT'S MOTION FOR RECONSIDERATION OF THE ARBITRATOR'S OCTOBER 17, 2024 ORDER

---

This motion was filed by Claimant, Jingoli Power, LLC ("JPOW") seeking to reconsider this Arbitrator's October 17, 2024, Order "the Arbitrator's Order" which Order was decided on a Motion to Dismiss the Respondent's Counterclaim for failure to state a claim, seeking to arbitrate non-arbitrable claims, and inclusion of non-signatories. The Claimant filed a moving Brief, Respondent filed her Opposition and JPOW filed its reply. Oral Argument occurred on December 18, 2024, with Robert Zoller, Esq. and Ms. Karlee Martin, Esq., appearing for Claimant, and Ms. Cris Armenta, Esq. and Mr. Earth Shah, Esq. appearing for Respondent. The Oral Argument was transcribed before a Certified shorthand reporter of the State of New Jersey, who prepared a transcript of the Motion hearing.

## QUESTIONS PRESENTED

1.) Does Respondent's Counterclaim sufficiently relate to the AVIVV's Operating Agreement to compel Arbitration?

2.) Does the Arbitration Clause in the AVIVV Operating Agreement apply to non-signatories in such a way that compels them to Arbitrate in this forum?

## SUMMARY OF PARTIES' ARGUMENTS

### I.    Claimant's Moving Papers

Claimant argues that "The Arbitrator's initial ruling misinterpreted the scope of the AVIVV arbitration clause and improperly permitted [Claimant] to join in the arbitration claims against non-signatories to the arbitration provision." See Claimant's Brief at 5.

Claimant's argument turns on the distinction between terms "arising out of" and "relating to" that often appear in arbitration clauses. See Claimant's Brief at 9. The AVIVV Operating Agreement compels arbitration of all "disputes of whatsoever nature arising out of" the AVIVV Operating Agreement. Claimant's interpretation of the available law results in "arising out of" being more restrictive than "relating to." Claimant's primary source of authority for this distinction comes from Deering v. Graham, No. 14-3435 (NLH/JS), 2015 WL 424534, at *7 (D.N.J. Jan. 30, 2015), an unpublished decision from the Federal District Court of New Jersey which explores whether tort claims of a sexual nature require reference to the contract containing the arbitration clause. See Id. at *1. Further, Claimant argues that the AVIVV Operating agreement controls "relations among the members as members" consistent with N.J.S.A. 42:2C-11. See Claimant's Brief at 12. Claimant therefore maintains that Respondent's claims are not inextricably linked to violations of the AVIVV Operating Agreement which controls what claims can be arbitrated. See Id. at 13.

Claimant also argues that because of Respondent's choice to file lawsuits in other venues, Respondent has waived her ability to seek Arbitration of all claims. Id. at 14. However, Claimant cites no authority for this proposition.

Claimant then argues that the claims against non-signatories to the AVIVV Operating Agreement are not arbitrable because the only way non-signatories can be compelled to arbitrate is by either: 1) embracing the contract during litigation but attempting to ignore the Contract in the Arbitration; or 2) by the non-signatory seeking a signatory to Arbitrate at the non-signatory's insistence. Id. at 16. Notably, the Claimant concedes that a non-signatory can also be bound under agency principles if an agency relationship relates to a cause of action in the Complaint. Id. at 15-16. The Claimant interprets available case law to mandate a third-party beneficiary relationship as opposed to an incidental beneficiary relationship to compel a non-signatory to Arbitrate. Id. at 17-18.

Additionally, compelling non-signatories to Arbitrate may frustrate their right to seek a jury trial because they did not knowingly waive their rights by virtue of their non-signatory status. Id. at 18.

## II.    Respondent's Opposition

Respondent fundamentally disputes the scope of the Arbitration clause at issue, arguing for a more expansive interpretation of the clause in the AVIVV Operating Agreement: "Any and all good faith differences and disputes of whatsoever nature arising out of this Agreement shall be resolved and finally settled by binding Arbitration." Respondent's Opposition at 2.

Concerning the holding of Deering, supra, the Respondent argues that the language in the Arbitration clause at issue there was expressly qualified to limit Arbitration to the consumer

relationship. <u>Respondent's Opposition</u> at 3. The language of "any and all" that is present in the AVIVV Operating Agreement refutes such a limitation here.

Respondent maintains that her tort claims are intertwined with the business claims, namely due to the tort claims being based on actions by agents of Claimant in furtherance of its business activities. <u>Id.</u> at 4. Respondent's relationship with Claimant and non-signatories as "members" in <u>N.J.S.A.</u> 42:2C-11 was frustrated in part due to the actions of Respondent's agents which form the basis for many of Claimant's tort claims. <u>Respondent's Opposition</u> at 7. Accordingly, the tort claims directly relate to the business claims and should be covered by the broad Arbitration clause.

Respondent argues that the decision of whether there has been any waiver of rights to Arbitration by Respondent is a question for the courts where other litigation is pending, not for this Arbitrator. <u>Id.</u> at 11.

Respondent directly addresses the Claimant's argument that the non-signatories should not be bound to arbitrate by explaining that the non-signatories have relied on the AVIVV Operating Agreement. <u>Id.</u> at 13. For example, Joseph Jingoli and Sons embraced the AVIVV Operating Agreement by alleging violations of the Agreement by Respondent in a separate NJ Court Action. <u>Id.</u> at 14. Karl Miller embraced the AVIVV Operating Agreement by virtue of his agency relationship with Claimant. <u>Id.</u> at 15. Finally, Respondent concludes by explaining that all non-signatories are in fact agents of the Claimant. <u>Id.</u> at 15-17.

### III.    <u>Claimant's Reply</u>

In reply, Claimant begins by arguing that <u>Deering, supra,</u> (D.N.J. Jan 30, 2015), supports the position that the arbitrability of claims should be limited due to the clause in the AVIVV Operating Agreement being more restrictive than the clause at issue there. <u>Claimant's Reply</u> at 2. Claimant then argues that the Respondent misinterprets the application of finding that the tort

claims and business claims are inextricably linked to the AVIVV Operating agreement as this analysis only matters for the purposes of binding non-signatories to Arbitration. Id. 5-6. Claimant then repeats the argument that Respondent's tort claims do not arise out of the AVIVV Operating Agreement. Id. at 9. Accordingly, Claimant believes that Respondent can "maintain its claim for damages without reference to, and reliance upon, the underlying contract." citing EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc., 410 N.J. Super. 453, 475 (App. Div. 2009); Claimant's Reply at 11. Claimant, however, offers no facts to support this conclusion. Claimant then argues that the decision by Respondent to litigate in other jurisdictions limits her right to Arbitrate her claims, but again, offers no authority for this proposition. Id. 12-14.

Claimant responds to the Respondent's assertion that non-signatories have embraced the Agreement, by referring to cases where Courts have found that so and attempting to distinguish those cases from the non-signatories, because the non-signatories benefit conferred would be too remote for them to embrace the AVIVV Agreement. Id. 14-17. Here again, Claimant offers no facts to support this position. Finally, Claimant takes issue with Respondent's suggestion that agency theory relates to the claims in Arbitration but provides no authority to refute Respondent's position. Id. at 17-18.

## STANDARD OF REVIEW

Since the Arbitrator's Order is interlocutory, the Standard of Review is governed by Rule 4:42-2, which "does not require a showing that the challenged order was 'palpably incorrect,' 'irrational,' or based on a misapprehension or overlooking of significant material presented on the earlier application." Cummings v. Bahr, 295 N.J. Super 374 (App. Div. 1996). Instead, "[u]ntil entry of final judgment, only 'sound discretion' and the 'interests of justice' guides the trial court, as Rule 4:42-2 expressly states." Id. The Rule does not impose a time limit for bringing such a

motion, rather provides that an Order is "subject to revision at any time before the entry of final judgment." Rule 4:42-2(b).

New Jersey Courts have held that to demonstrate the sound discretion standard to reconsider an interlocutory Order, the movant must show good cause for reconsideration. See, Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017).

The Commercial Arbitration Rules and Mediation Procedures which govern this Arbitration are silent as to Motions to Reconsider Interlocutory Orders. See generally, AAA Commercial Rules. Accordingly, this Arbitrator must consider in his sound discretion in the interest justice whether good cause has been shown by claimant to reconsider the Arbitrator's Order.

## ANALYSIS

I.    **Claimant provides no conclusive authorities to support its interpretation that the Arbitration clause in the AVIVV Operating Agreement is restrictive to the point that it excludes Respondent's tort claims.**

Arbitration agreements are to be read broadly in favor of Arbitration. Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001). Courts are loathe to find Arbitration unenforceable and must always limit such exclusion to instances where statute or legislative history precludes Arbitration. Alamo Rent A Car, Inc. v. Galarza, 306 N.J. Super. 384, 389, 703 A.2d 961 (App.Div.1997). Courts seek to avoid bifurcation of disputes between judicial venues and Arbitration. See Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc., 240 N.J. Super. 370, 375 (App. Div. 1990). However, Arbitration agreements have limits and depend on a consensual understanding of what issues are covered by any Arbitration clause. See Garfinkel supra, (2001). To that end, a tribunal cannot broaden the scope of Arbitration beyond what is agreed to by the parties. See Id.

Courts have compelled Arbitration where a party could not "maintain its claim for damages without reference to, and reliance upon, the underlying contract." EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc., 410 N.J. Super. 453, 475 (App. Div. 2009). If a claim draws from "the fact of and performance under the agreement in question," then the claim relies on the underlying contract. Id. Although the parties spend significant time arguing the meaning of "arising out of" and "relating to," the exact language in the operating Agreement does not overcome the factual inquiry required to determine whether a parties' claims can be made without reference to the AVIVV Operating Agreement. Even then, no case law clarifies the exact difference of parameters when an Arbitration provision uses the language "arising out of" or "relating to." See, Yale Materials Handling Corp., supra. (App. Div 1990), What significance is the more expansive "relating to" if the claims at issue might be covered by "arising out of?" Where the parties have not unequivocally excluded a particular form of dispute from Arbitration, then Courts will choose to compel Arbitration. See, Salvadiro v. Option One Mortgage Corp., 420 F. Supp. 2d 349, 356 (D.N.J. 2006).

No factual record has been developed to clarify the exact understanding of the parties concerning what matters are to be Arbitrated in this case. However, during oral argument, Claimant's Counsel admitted that he may have done a "poor job" when presenting some arguments in his motion papers, but nonetheless attempted to outline what Claimant considers the analytical framework to exist in New Jersey. Transcript, page 6, line 7. Yet, this provides no information concerning the factual basis or understanding for which matters are to be Arbitrated here.

Although there may eventually be reason to find good cause to reconsider the Arbitrator's Order concerning Respondent's tort claims, at present, there is no record to consider and no new,

authoritative law that binds this Arbitrator in his sound discretion and in the interest of justice to limit the claims of Respondent.

II.   **Claimant provides no conclusive authority to support its argument that Respondent's choice to file lawsuits in other forums has frustrated Respondent's right to Arbitrate.**

Courts have the authority to determine when a party has waived its right to Arbitrate. Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 217-18 (3d Cir. 2007); See also Quilloin v. Tenet Health System Phila., Inc., 673 F.3d 221, 228 (3d Cir. 2012).

Claimant provides no authority for its argument that Respondent has waived her right to Arbitrate her counterclaims by filing actions in other legal Fori. At oral argument, Claimant's attorney attempted to clarify that his argument was ultimately not based on "an issue of waiver," Transcript page 13, line 16, but the Claimant's brief said just that. Claimant's Brief at 14 ("...Beal waived any right she had to pursue those claims in arbitration by litigating those very claims in California State Court."). Therefore, no authority binding on this Arbitrator limits Respondent's Counterclaims based on her decision to file claims in non-arbitral venues.

III.   **The absence of a record is fatal to Claimant's position that the non-signatories have not embraced the contract, nor can Claimant disprove an agency relationship that imputes liability.**

New Jersey District Courts appear split on the issue of when non-signatories of an Arbitration agreement can be bound to Arbitrate. The US District Court in Deering found that intertwinement of issues was necessary for a non-signatory to be compelled to Arbitrate when there was an inextricable link between the plaintiff's claims, the signatory and non-signatories. Deering supra, (D.N.J. Jan. 30, 2015). In contrast, the US District Court has also found that a non-signatory must show detrimental reliance for the non-signatory to compel Arbitration. Sicily by Car S.p.A. v. Hertz Glob. Holdings, Inc., Civil Action No. 14-6113 (SRC), 2015 U.S. Dist. LEXIS

65751, at *12-15 (D.N.J. May 20, 2015). Notably both cases involve situations where a non-signatory was seeking to enforce an Arbitration provision.

The Third Circuit provided some guidance explaining that when considering whether to force a non-signatory to Arbitrate, Courts refer to theories of contract and agency law, asking whether the non-signatory is, for practical purposes, acting as a signatory to the Agreement. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 194 (3d Cir. 2001). Similarly, the New Jersey Supreme Court in Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174 (2013), rejected the intertwinement theory when there was no written Arbitration Agreement, but nonetheless emphasized the significance of an agency relationship between the non-signatory that may be compelled to Arbitrate by the signatory to an Arbitration Agreement. Id. at 192-93. Clearly, the nature of the parties' agency relationship depends on a fact specific inquiry. See Precision Funding Grp., LLC v. Nat'l Fid. Mortg., No. 12-5054, 2013 WL 2404151, at *5 (D.N.J. May 31, 2013).

Here, the Respondent claims that there exists both an agency relationship between the non-signatory parties and that those same non-signatory parties embraced the AVIVV operating agreement such that they are compelled to Arbitrate. Respondent's Opposition p13-17. The Claimant has produced no facts to refute the Respondent's arguments that the non-signatories named in her counterclaim were agents of Claimant or embraced the AVIVV Operating Agreement. As a consequence, there is no record to consider and no new authoritative law that binds this Arbitrator in his sound discretion and in the interest of justice to dismiss the Respondent's claims against the non-signatories to the AVIVV Operating Agreement.

## Opinion and Decision of Arbitrator

For all the foregoing reasons the Claimant's Motion for Reconsideration of the Arbitrator's

Order be and the same is hereby denied.

_____

By: Arbitrator, Paul A. Sandars, III, Esq.

DATED: JANUARY 8, 2025

# EXHIBIT B

CONTRACTORS  |  CONSTRUCTION MANAGERS

# JINGOLI

December 22, 2023

**VIA FED EX, FACSIMILE, AND E-MAIL** TEXI2CALI@GMAIL.COM

Erica L. Beal
6347 Park Ridge Boulevard
San Diego, CA 92120

Re: Subcontract for Subcontractor Services dated June 17, 2020 between AVIVV,
  LLC and Joseph Jingoli & Son, Inc.
  **NOTICE OF MATERIAL CONTRACTUAL BREACH AND DEMAND
  FOR IMMEDIATE CURE**

Dear Ms. Beal:

  As you know, JJS, as contractor, and AVIVV, as subcontractor, are parties to that certain Subcontract for Subcontractor Services dated June 17, 2020 ("Subcontract"), under which AVIVV agreed, among other things, to provide certain services to JJS for compensation. The Subcontract incorporates by reference and includes the terms of the Master Agreement for Construction Services dated November 1, 2018, between JJS and SDG&E ("Prime Contract"). (Subcontract, Article I.)

  Under the Subcontract, AVIVV is and was obligated to "comply with all applicable laws, regulations, and orders in the performance of the Work," to "comply fully with all applicable laws, ordinances, rules and regulations" and, finally, to maintain all "required licensing and certification." (Subcontract, Articles VIII, X, and XVII.) Those obligations notwithstanding, it has come to JJS's attention that AVIVV's Certificate of Eligibility as a Minority Business Enterprise under the CPUC's Utility Supplier Diversity Program (the "MBE Certification") expired on December 18, 2023, and has not been renewed. As the qualifying partner for AVIVV's MBE Certification, it is and was your individual responsibility to ensure that the MBE Certification remained valid and in place at all times. The expiration of the MBE Certification impairs JJS's compliance and reporting obligations under the Prime Contract (see Prime Contract ¶ 23 and Schedule D), and generally places JJS's compliance under the Prime Contract at risk.

  **Thus, this letter provides notice that AVIVV is in material breach of the Subcontract for allowing the MBE Certification to expire, and to remain expired. Demand is hereby made that you and AVIVV cure that breach by causing the MBE Certification to be renewed and reactivated no later than 5:00 p.m. PST on January 5, 2024. Please be advised that if you and AVIVV fail to renew and reactivate the MBE Certification by that time, JJS will be contractually entitled, and intends, to immediately terminate the Subcontract for cause. (Subcontract, Article X.)**

  Finally, please be advised that this letter is not an all-inclusive statement of JJS's or JPOW's claims, whether under the Subcontract or otherwise. All rights, claims, arguments, remedies, and defenses are reserved.

# JINGOLI

CONTRACTORS · BUILDERS · CONSTRUCTION MANAGERS

Very truly yours,

Joseph R. Jingoli, Jr.
CEO

cc (*via e-mail*): Mark-Robert Bluemel, Esq. (mbluemel@mcdougallawfirm.com)
             Thomas J. Palma, Esq. (tpalma@cmsllc.law)

# JINGOLI

CONTRACTORS  |  CONSTRUCTION MANAGERS

January 8, 2024

**VIA FED EX AND E-MAIL TEXI2CALI@GMAIL.COM**

Erica L. Beal
6347 Park Ridge Boulevard
San Diego, CA 92120

Re:     Subcontract for Subcontractor Services dated June 17, 2020 between AVIVV,
        LLC and Joseph Jingoli & Son, Inc.
        **NOTICE OF TERMINATION OF SUBCONTRACT FOR CAUSE**

Dear Ms. Beal:

As you know, on December 22, 2023, JJS provided the enclosed written notice ("Notice") to you and AVIVV that AVIVV is in material breach of the JJS-AVIVV Subcontract for allowing its MBE Certification to expire and remain expired. The Notice demanded cure by renewal and reactivation of the MBE Certification no later than 5:00 p.m. PST on January 5, 2024.

As of today's date, the MBE Certification has not been renewed or reactivated, and we have received no response to the Notice from AVIVV or you. As a consequence of AVIVV's failure to cure, this letter provides notice that, pursuant to Article X of the Subcontract, the Subcontract and all associated Work Orders are hereby terminated, <u>for cause</u>, with immediate effect.

As before, JJS and JPOW reserve all rights, claims, arguments, remedies, and defenses.

Very truly yours,

Joseph R. Jingoli, Jr.
CEO

Enclosure as noted

cc (*via e-mail, w/ encl.*): Mark-Robert Bluemel, Esq. (mbluemel@mcdougallawfirm.com)
                        Thomas J. Palma, Esq. (tpalma@cmsllc.law)

# EXHIBIT C

CONTRACTORS  |  CONSTRUCTION MANAGERS

# JINGOLI

December 22, 2023

**VIA FED EX, FACSIMILE, AND E-MAIL TEXI2CALI@GMAIL.COM**

Erica L. Beal
6347 Park Ridge Boulevard
San Diego, CA 92120

Re:    Subcontract for Subcontractor Services dated June 17, 2020 between AVIVV,
       LLC and Joseph Jingoli & Son, Inc.
       **NOTICE OF MATERIAL CONTRACTUAL BREACH AND DEMAND
       FOR IMMEDIATE CURE**

Dear Ms. Beal:

As you know, JJS, as contractor, and AVIVV, as subcontractor, are parties to that certain Subcontract for Subcontractor Services dated June 17, 2020 ("Subcontract"), under which AVIVV agreed, among other things, to provide certain services to JJS for compensation. The Subcontract incorporates by reference and includes the terms of the Master Agreement for Construction Services dated November 1, 2018, between JJS and SDG&E ("Prime Contract"). (Subcontract, Article I.)

Under the Subcontract, AVIVV is and was obligated to "comply with all applicable laws, regulations, and orders in the performance of the Work," to "comply fully with all applicable laws, ordinances, rules and regulations" and, finally, to maintain all "required licensing and certification." (Subcontract, Articles VIII, X, and XVII.) Those obligations notwithstanding, it has come to JJS's attention that AVIVV's Certificate of Eligibility as a Minority Business Enterprise under the CPUC's Utility Supplier Diversity Program (the "MBE Certification") expired on December 18, 2023, and has not been renewed. As the qualifying partner for AVIVV's MBE Certification, it is and was your individual responsibility to ensure that the MBE Certification remained valid and in place at all times. The expiration of the MBE Certification impairs JJS's compliance and reporting obligations under the Prime Contract (see Prime Contract ¶ 23 and Schedule D), and generally places JJS's compliance under the Prime Contract at risk.

**Thus, this letter provides notice that AVIVV is in material breach of the Subcontract for allowing the MBE Certification to expire, and to remain expired. Demand is hereby made that you and AVIVV cure that breach by causing the MBE Certification to be renewed and reactivated no later than 5:00 p.m. PST on January 5, 2024. Please be advised that if you and AVIVV fail to renew and reactivate the MBE Certification by that time, JJS will be contractually entitled, and intends, to immediately terminate the Subcontract for cause. (Subcontract, Article X.)**

Finally, please be advised that this letter is not an all-inclusive statement of JJS's or JPOW's claims, whether under the Subcontract or otherwise. All rights, claims, arguments, remedies, and defenses are reserved.

CONTRACTORS • CONSTRUCTION MANAGERS

# JINGOLI

Very truly yours,

Joseph R. Jingoli, Jr.
CEO

cc (*via e-mail*): Mark-Robert Bluemel, Esq. (mbluemel@mcdougallawfirm.com)
Thomas J. Palma, Esq. (tpalma@cmsllc.law)

# EXHIBIT D

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF

# AVIVV, LLC

This Limited Liability Company Operating Agreement (including the appendices attached hereto, the "Agreement") of AVIVV, LLC, a New Jersey multi-member limited liability company ("AVIVV" or "Company"), is made as of the 10th day of September, 2019, by and among Erica L. Beal ("Beal") and Jingoli Power, LLC, a New Jersey limited liability company ("JPOW"). Beal and JPOW are collectively referred to herein as "Members" and individually as a "Member".

**ARTICLE I**     **Definitions.**

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I unless otherwise expressly provided.

1.1     **"Act"** means the New Jersey Limited Liability Company Act, as amended.

1.2     **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

       (i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Operating Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

       (ii)     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704(b)(2)(ii)(d)(6).

       The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1 (b)(2)(ii)(d) and shall be interpreted consistently therewith.

1.3     **"Affiliate"** means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. "Controlled Affiliate" means, with respect to any Person: (a) any Person directly or indirectly controlled by such Person, and (b) any Person a majority of whose equity securities are owned directly or indirectly by such Person. For purposes of these definitions, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.4     **"Agreement"** means the Limited Liability Company Operating Agreement of the Company made by Erica L. Beal and Jingoli Power, LLC, as the Members of the Company.

**1.5**    **"Assets"** has the meaning defined in Section 3.1 (a).

**1.6**    **"Business"** has the meaning given that term in Section 3.1.

**1.7**    **"Capital Account"** means, with respect to any Member, the Capital Account maintained for such Person in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Property distributed to such Member.

(ii)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.8 or 4.9 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(iii)   In the event any interest in the Company is transferred in accordance with the terms of this Operating Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability for purposes of Sections 1.7(i) and 1.7(ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Operating Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.7041 (b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Executive Committee shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Executive Committee may make such modification, provided that is not likely to have a material effect on the amounts distributable to any Member pursuant to Article IX hereof upon the dissolution of the Company.  The Executive Committee also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.7041(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event

unanticipated events might otherwise cause this Operating Agreement not to comply with Regulations Section 1.7041(b).

**1.8** **"Capital Contribution"** means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to the Percentage Interest held by such Member pursuant to the terms of this Operating Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or by a Person related to the maker of the note within the meaning of Regulations Section 1.7041(b)(2)(ii)(c)) shall not be included in the Capital Contribution of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.7041(b)(2)(iv)(d)(2).

**1.9** **"Company Minimum Gain"** refers to "partnership minimum gain" as set forth in Regulations Sections 1.7042(b)(2) and 1.7042(d).

**1.10** **"Certificate of Formation"** means the Certificate of Formation of the Company as filed with the Secretary of State of New Jersey, as the same may be amended or restated from time to time.

**1.11** **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**1.12** **"Company"** means AVIVV, LLC, a New Jersey Limited Liability company.

**1.13** This section has been intentionally omitted.

**1.14** **"Controlled Affiliate"** has the meaning defined in Section 1.3.

**1.15** **"Covered Person"** is any Member, Executive Committee member, employee or agent of the Company.

**1.16** **"Depreciation"** means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Executive Committee.

**1.17** **"Effective Date"** means the date on which the Certificate of Formation is filed with the New Jersey Secretary of State, or such later date as may be specified in the Certificate of Formation.

**1.18** **"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Members;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Executive Committee, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Regulations Section 1.7041(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Executive Committee reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Executive Committee; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sections 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.7041 (b)(2)(iv)(m) and Sections 2.01(42)(vi) and 9.03(e) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.18(iv) to the extent the Executive Committee determines that an adjustment pursuant to Section 1.18(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.18(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to these Sections 1.18(i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

**1.19**    This section has been intentionally omitted.

**1.20**    **"Entity"** means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or any foreign trust, or foreign business organization.

**1.21**    **"Event of Dissolution"** has the meaning defined in Section 9.1.

**1.22**     **"Executive Committee"** has the meaning defined in Section 5.2(a).

**1.23**     **"Fiscal Year"** means (i) the period commencing on the Effective Date and ending on the immediately succeeding December 31, and (ii) any subsequent twelve month period commencing on January 1 and ending on December 31, and any portion of said subsequent period for which the Company is required to allocate Profits, Losses, and other items of Company income, gain, loss, or deduction.

**1.24**     This section has been intentionally omitted.

**1.25**     This section has been intentionally omitted.

**1.26**     **"Member"** or "**Members**" means Erica L. Beal and/or Jingoli Power, LLC.

**1.27**     This section has been intentionally omitted.

**1.28**     **"Member Nonrecourse Debt"** Refers to "partner nonrecourse debt" as set forth in Regulations Section 1.7042(b)(4).

**1.29**     **"Member Nonrecourse Debt Minimum Gain"** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.7042(i)(3).

**1.30**     **"Member Nonrecourse Deductions"** Refers to "partner nonrecourse deductions" as set forth in Regulations Sections 1.7042(i)(1) and 1.7042(i)(2).

**1.31**     **"Net Cash From Operations"** means the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Executive Committee. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**1.32**     **"Nonrecourse Deductions"** has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.33**     "**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.7042(b)(3).

**1.34**     **"Percentage Interest"** means, subject to Section 4.3, as to Beal having 51% of all interests in the Company and JPOW having 49% of all interests in the Company, which shall be such Member's percentage share of (i) total Profits or Losses of the Company to be allocated; (ii) the total amount of the initial and each additional capital contribution; and (iii) the total amount of each distribution.

-5-

**1.35** **"Person"** means any individual or Entity, and the executors, administrators, legal representatives, successors, and assigns of a "Person" when the context so permits.

**1.36** **"Profits and Losses"** means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.7041(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or added to such loss;

(iii)   In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18(ii) or Section 1.18(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)    Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with Section 1.16 hereof;

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required pursuant to Regulations Section 1.7041(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses;

(vii)   Notwithstanding any other provision of this Section 1.36, any items which are specially allocated pursuant to Sections 4.8 and 4.9 hereof shall not be taken into account in computing Profits or Losses; and

(viii)   The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 4.8 and 4.9 hereof shall be determined by applying rules analogous to those set forth in Sections 1.36(i) through 1.36(vii) above.

**1.37**   "**Property**" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

**1.38**   "**Regulations**" means Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**1.39**   "**Regulatory Allocations**" has the meaning set forth in Section 4.9 hereof.

**1.40**   This section has been intentionally omitted.

**1.41**   This section has been intentionally omitted.

**1.42**   "**Taxing Jurisdiction**" means any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**1.43**   "**Transfer**" means, in either noun or verb form, any voluntary or involuntary transfer, sale, or other disposition.

## ARTICLE II    Formation, Term, Name and Status.

**2.1**   **Formation**. The Company was formed pursuant to Section 11 of the Act, on September 10, 2019 (the "Date of Formation"), by the filing of a Certificate of Formation (the "Certificate") with the New Jersey Department of Treasury, Division of Revenue thereby establishing the Company as a New Jersey limited liability company. The Company shall be operated and shall conduct its business in accordance with the Act, except to the extent modified by the terms of this Agreement. Upon the execution of the Operating Agreement and the proper filing of the Certificate of Formation with the New Jersey Department of Treasury, Division of Revenue, Beal and JPOW shall be admitted as the Members of the Company.

**2.2**   **Term**. The term of the Company shall commence on the Effective Date and, unless sooner dissolved in accordance with this Agreement or as required by statute, shall be perpetual.

2.3     **Name**. The name of the Company is AVIVV, LLC.

2.4     **No State Law Partnership, Liability to Third Parties**. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership), and that no Member be a partner or joint venture of any other Member nor assume the duties that either such status may impose, for any purposes other than federal and state tax purposes, and that this Agreement not be construed otherwise. Except to the limited extent expressly provided in Section 7.3(a), no Member shall be liable for the debts, obligations or liabilities of the Company to third parties, including under a judgment, decree or order of a court.

2.5     **Agreement, Effect of Inconsistencies with Act**. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions of this Operating Agreement, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Operating Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, this Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members hereby agree that each Member shall be entitled to rely on the provisions of this Operating Agreement, and no Member shall be liable to the Company or to any Member for any action or refusal to act taken in good faith reliance on the terms of this Operating Agreement. The Members hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Operating Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

2.6     **Confirmation of Status, Scope of Authority**. Each Member hereby confirms and agrees to its status as a Member upon the terms and conditions set forth in this Agreement.

2.7     **Principal Office**. The principal office of the Company shall be located at 100 Lenox Drive, Suite 100, Lawrenceville, NJ 08648.

**ARTICLE III**    Purpose, Exclusive Dealings, and Assets.

**3.1    Purpose.**

(a)    The Company is being organized for the purpose of providing project execution services for private and public utility projects, specifically electric transmission, substation and distribution projects, including: (i) engineering, procurement and construction contracts; (ii) general contractor services; (iii) staff augmentation professional services; (iv) construction and project management services; and (v) any other activity to which the Members agree. (the "Business"). The Executive Committee shall have no authority to undertake any activity outside of the parameters of the Business without the approval of the Members.

(b)    In addition, the Company may engage in any act concerning any or all other business or activity that now or hereafter may be necessary, incidental, proper, advisable, or convenient to accomplish the foregoing purposes and that is not forbidden by the law of the jurisdiction in which the Company engages in that business; provided, however, that notwithstanding anything stated herein to the contrary, the Company shall not engage in any activity which would cause the Company to be a "public utility company" or a "holding company" as such terms are used in the Public Utility Holding Company Act of 1935, as amended. The Company may accomplish the purposes set forth in this Section 3.1 by entering into any contract, subject to the provisions of this Agreement, or taking any other action permitted under the Act and any other applicable law and necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

(c)    Any Member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company nor the Members shall have any right by virtue of this Agreement in such other business ventures or to the income or profits derived there from.

(d)    The Company exists only for the purposes specified in this Article III, and may not conduct any business other than the Business without the approval of the Members. Furthermore, notwithstanding the provisions of this Agreement, the Company shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Members under the Act or this Operating Agreement.

**3.2    Responsibility for Warranties and System Support.** No Member shall be responsible for any warranties or guarantees provided by the Company. The Company shall be solely responsible for any warranties or guarantees arising in the operation of the Business.

**ARTICLE IV**    Member Contributions, Allocations, Distributions and Taxes.

**4.1    Initial Capital Contribution.** The names, addresses, initial Capital Contributions, and Percentage Interests of the Members are set forth below. The initial Capital Contributions shall be made concurrently with the last execution of this Operating Agreement. The Members acknowledge that the interests in the Company have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Members without appropriate registration or the availability of an exemption from such requirements.

| | | |
|---|---|---|
| ERICA L. BEAL<br>5173 Waring Road<br>Suite 87<br>San Diego, CA  92120 | $1,501 | 51% Percentage Interest |
| JINGOLI POWER, LLC<br>100 Lenox Drive<br>Suite 100<br>Lawrenceville, NJ 08648 | $1,500 | 49% Percentage Interest |

**4.2    Capital Accounts.** A Capital Account shall be established and maintained for the Members.

**4.3    Additional Capital Contributions.**

Additional monetary Capital Contributions may be requested by the Executive Committee in its reasonable discretion as may be needed to cover ongoing operating expenses or to cover losses the Company has incurred. Such additional monetary Capital Contributions shall be payable in cash in proportion to the Percentage Interests of the Members. Except as stated above, no Member shall be required to make any additional monetary capital contributions.

**4.4    Loans.** If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution of the Company but shall be a debt due from the Company. The amount of such loan or advance by a lending Member shall be repayable out of the Company's cash and shall bear reasonable interest at the rate agreed between the Company and the lending Member.

**4.5    Other Matters.**

(a)    Under circumstances requiring a return of any Capital Contributions, no Member shall have the right to receive property other than cash except as may be specifically provided herein.

(b)    No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise provided in this Operating Agreement.

(c)     Each Member waives any and all rights that it may have to maintain an action for partition of the Company's Property.

**4.6    Profits.** After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Profits for any Fiscal Year shall be allocated to the Members.

**4.7    Losses.**

(a)     After giving effect to the special allocations set forth in Sections 4.8 and 4.9 hereof, Losses for any Fiscal Year shall be allocated to the Members.

(b)     The Losses allocated pursuant to Section 4.7(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing the Members to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.

**4.8    Special Allocations.** The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.7042(f), notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any Company Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.7042(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(f)(6) and 1.70420(2). This Section 4.8(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.7041 (f) and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback.  Except as otherwise provided in Regulations Section 1.7041 (i)(4), notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.7042(i)(4) and 1.70420)(2). This Section 4.8(b) is intended to comply with the minimum gain chargeback

requirement in Regulations Section 1.7042(i)(4) and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members.

(d)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member.

(e)     Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Sections 1.7041(b)(2)(iv)(m)(2) or 1.7041(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member.

(f)     Allocations Relating to Taxable Issuance of Percentage Interests. Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Operating Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(g)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Sections 1.7041(b)(2)(ii)(d) (4), 1.704(b)(2)(ii)(d)(5), or 1.7041(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.8(g) shall be made only if and to the extent that such Member would have an adjusted Capital Account Deficit after all other allocations provided for in this Section 4.8 have been tentatively made as if this Section 4.8(g) were not included in this Operating Agreement.

**4.9     Curative Allocations.** The allocations set forth in Sections 4.8(a), 4.8(b), 4.8(c), 4.8(d), 4.8(e) and 4.8(g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.9. Therefore, notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Executive Committee shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible,

equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all Company items were allocated pursuant to Sections 4.6 and 4.7 hereof. In exercising its discretion under this Section 4.9, the Executive Committee shall take into account future Regulatory Allocations under Sections 4.8(a) and 4.8(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.8(c) and 4.8(d).

**4.10    Other Allocation Rules**.

(a)    The Members are aware of the income tax consequences of the allocations made by this Article IV and hereby agrees to be bound by the provisions of this Article IV in reporting their shares of Company income and loss for income tax purposes.

(b)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Executive Committee using any permissible method under Code Section 706 and the Regulations thereunder.

(c)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.7523(a)(3), the Members' interests in Company profits are in proportion to their Percentage Interests.

(d)    To the extent permitted by Regulations Section 1.7042(h)(3), the Executive Committee shall endeavor not to treat distributions of Net Cash from Operations as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

**4.11    Tax Allocations; Code Section 704(c)**. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Section 1.18 hereof).

In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 1.18 hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Executive Committee in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 4.11 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Operating Agreement.

**4.12    Tax Characterization and Returns**.

(a)    The Members acknowledge that the Company will be treated as a "partnership" for federal and State of New Jersey state tax purposes. All provisions of this Operating Agreement and the Company's Articles of Organization are to be construed so as to preserve that tax status.

(b)    In accordance with Section 10.3, within ninety (90) days after the end of each Fiscal Year, the Executive Committee will cause to be delivered to each person who was a Member at any time during such Fiscal Year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of each Member's federal or state income tax (or information) returns, including a statement showing each Member's share of income, gain or loss, and credits for the Fiscal Year.

**4.13    Tax Elections**. The Executive Committee may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company, including the election referred to in Code Section 754 to adjust the basis of Company assets.

**4.14    Taxes of Taxing Jurisdictions**. To the extent that the laws of any Taxing Jurisdiction require, each Member (or such Members as maybe required by the Taxing Jurisdiction) will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income.

The Tax Partner on behalf of the Executive Committee, where permitted by the rules of any Taxing Jurisdiction, may file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**4.15    Tax Matters Partner**. JPOW is initially designated as the "tax matters partner" of the Company pursuant to Code Section 321 (a)(7). Any Member designated as tax matters partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. Any Member who is designated tax matters partner may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the other Member.

**ARTICLE V    Management.**

**5.1    Management by the Members**. The business and affairs of the Company shall be directed by its Members in accordance with the provisions of this Agreement as set forth below.

**5.2 Executive Committee**.

(a)    The Company shall be managed by and at the direction of its Members, Beal and JPOW. The Company shall be managed through a committee consisting of Beal and one representative of JPOW (the "Executive Committee"). Each meeting of the Executive Committee shall be deemed a meeting of the Members. Meetings of the Members (apart from meetings of the Executive Committee) are neither necessary nor required.

(b)    From time to time, the Members shall elect its representatives to the Executive Committee, and such election shall be communicated in writing to the Company. At the time of formation, Beal is a representative and JPOW names Brian J. Gibson as its representative.

(c)    The Executive Committee shall have the authority to manage and establish policies and strategies of the Company including, without limitation, the authority to:

(i)    enter into any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance and operation of the property of the Company, or in connection with managing the affairs of the Company, including amendments to this Agreement and the Certificate of Formation in accordance with the terms of this Agreement;

(ii)    allocate and distribute Profits and Losses to Members in accordance with their Percentage Interests;

(iii)    establish an Operating Committee, if desired, establish and modify Operating Committee Procedures from time to time;

(iv)    establish reserves from Profits which otherwise would be distributed to Members;

(v)    borrow money and issue evidence of indebtedness necessary, convenient, or incidental to the accomplishment of the purpose of the Company; and secure the same by mortgage, pledge, or other lien on any property or asset of the Company;

(vi)    prepay in whole or part, refinance, recast, increase, modify or extend any liabilities affecting the property of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such property;

-15-

(vii)    invest, manage, and distribute Company funds to the Members in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement, including but not limited to opening and maintaining Company bank accounts and authorizing signatories with respect thereto;

(viii)    employ accountants, legal counsel, managing agents and other Persons (including but not limited to Affiliates of Members, subject to Section 6.1 of the Agreement) to perform service for the Company and to compensate them from Company funds;

(ix)    make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (A) to adjust the basis of property of the Company pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with Company distributions; (B) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state, or local tax returns; and (C) to the extent provided in Code Sections 6221 through 6231, to represent the Company and its Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and its Members, and to file any tax returns and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members;

(x)    institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(xi)    engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to property of the Company) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the Act;

(xii)    take, or refrain from taking, all actions not expressly proscribed or limited by or addressed in this Agreement, as may be necessary or appropriate to accomplish the purposes of the Company, including but not limited to the establishment, maintenance, and expenditure of reserves to provide for working capital, debt service, and such other purposes as it may deem necessary or advisable;

(xiii)    sell all or substantially all of the assets of the Company;

(xiv)   merge or consolidate the Company;

(xv)   mortgage or encumber all or substantially all of the assets of the Company;

(xvi)   approve the Company's budget;

(xvii)   vote to dissolve the Company;

(xviii)  vote to seek bankruptcy protection for the Company; and

(xix)   distribute excess cash to the Members.

(d)   Any decision or act of the Executive Committee taken in accord with the provisions of this Agreement shall control and bind the Company.

(e)   Any Member may replace any or all of its representatives on the Executive Committee at any time.

**5.3   Decisions of the Executive Committee.**   All decisions of the Executive Committee require the assent of a majority of the membership interests held in the Company

**5.4   Right to Rely on Executive Committee.**

(a)   Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any member of the Executive Committee as to:

(i)   the identity of any member of the Executive or Operating Committees or Member of the Company;

(ii)   the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Executive Committees or which are in any other manner germane to the affairs of the Company;

(iii)   the Persons who are authorized to execute and deliver any instrument or document of the Company; or

(iv)   any act or failure to act by the Company or any other matter whatsoever involving the Company or any member of the Executive Committee, or any Member of the Company.

(b)   The signature of any Member of the Executive Committee shall be sufficient to execute any document or authorize payment on behalf of the Company, provided that such action has been properly authorized by the Executive Committee.

**5.5**     **Designation of Officer Titles**.  The Members may provide officer titles for members of the Executive Committee of the Company.  The officer titles may include, but shall not be limited to, a Chairman, a President, one or more Vice Presidents, a Treasurer, a Secretary and such other officer titles as the Members decide to appoint.

The Executive Committee shall appoint and elect, and shall have the power to terminate and remove with or without cause, such officers ("**Officers**") as it determines necessary or expedient in carrying out the Company's business and affairs.  Such Officers shall have such duties, responsibilities and authority as shall be delegated to each of them by the Executive Committee.  Other Officers may from time to time be elected by the Executive Committee and be given such titles, duties and responsibilities as are commensurate with their duties and responsibilities as determined by the Executive Committee.  The Executive Committee shall have authority to fix the compensation of, and to enter into employment agreements with, any Officer of the Company on such terms as the Executive Committee shall determine in each individual case in its sole and absolute discretion.

As of the date hereof, the Company shall have an Officer that is designated as the Managing Partner.  Beal shall be the initial Managing Partner.  The Managing Partner, subject to the direction of the Executive Committee, shall have general charge of the business, affairs and property of the Company and general supervision of its other Officers and agents.  Unless otherwise prescribed by the Executive Committee, the Managing Partner shall have full power and authority on behalf of the Company to attend, act and vote at any meeting of security holders of any corporations, partnerships, limited liability companies or other business entities in which the Company may hold securities.  At such meeting(s), the Managing Partner shall possess and may exercise any and all rights and powers incident to the ownership of such securities which the Company might have possessed and exercised if it had been present. The Managing Partner shall have authority to sign and execute in the Company name all appropriate agreements, mortgages, bonds, contracts and other instruments, except in cases in which the signing or execution thereof shall be expressly delegated by the Executive Committee to some other officer or agent of the Company. The Executive Committee may from time to time confer like powers and authority upon any other person or persons.

The Managing Partner has established the following Officer positions:

Chief Executive Officer: Erica L. Beal
President: Brian J. Gibson

Only the Managing Partner may amend the appointment of the Officers.

**5.6**     **Functioning of the Executive Committee**

(a)     Quorum and Voting.  The majority of membership interests must be represented at a meeting of the Executive Committee in order to have a quorum for the

conducting of business. Votes shall be determined based on percentage of membership interests held and all decisions are by majority vote

(b)  Chairman. One of the members of the Executive Committee shall serve as the Chairman of the Executive Committee for a term of one year. The initial Chairman of the Executive Committee shall be Erica L. Beal.

(c)  Meetings. Regular meetings of the Executive Committee shall be held as determined by the Chairman of the Executive Committee, but at least twice annually. Members of the Executive Committee may participate in a meeting of the Executive Committee by a means of a conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other and be heard sufficiently to permit contemporaneous exchange and debate. Participation in a meeting in this manner shall constitute presence in person at the meeting.

(d)  Notice, Waiver, and Minutes. All members of the Executive Committee shall receive a notice of each regular meeting of the Executive Committee together with a copy of the proposed agenda for such meeting at least five days prior to a scheduled regular meeting date. The Chairman or any two members of the Executive Committee may, upon two days' notice (such notice to include a proposed agenda) to the other members of the Executive Committee, call a special meeting of the Executive Committee at any time. Attendance at any meeting of the Executive Committee (either in person or by means of conference telephone or similar communications equipment) shall constitute waiver of notice thereof. The Executive Committee shall cause minutes of its meetings to be kept which shall be open for inspection by any Member at any time.

(e)  Alternate Representatives. Each member of the Executive Committee shall be entitled to appoint (and to change) an alternate representative to attend meetings of the Executive Committee in such member's place. An alternate may not be a member of the Executive Committee in his own right. An alternate representative shall not be entitled to vote in his capacity as such at any meeting at which his appointer is present.

(f)  Action Without Meeting. Any action which may be taken by the Executive Committee at a meeting thereof may be taken without a meeting by the unanimous written consent of all members of the Executive Committee.

## ARTICLE VI        RESERVED

## ARTICLE VII    Liabilities, Limitation of Liabilities and Indemnification.

**7.1    Limitation of Liability of Members, and Executive Committee Members.** It is specifically understood and agreed that:

(a)  a Member or Executive Committee member shall not be required to devote full time to Company business;

(b)     no doctrine similar to the doctrine of corporate opportunity shall apply with regard to the actions or activities of any Member or Executive Committee member;

(c)     except as expressly otherwise provided herein to the contrary, each Member and Executive Committee member shall be free to conduct any business or activity whatsoever, without obligation to the Company or the Member;

(d)     except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person; and

(e)     except as otherwise required by law, a Member, in its capacity as Member, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed Profits of the Company, (iii) its obligation to make other payments expressly provided for in this Operating Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

**7.2     Actions Beyond Scope of Agreement**.  Any Member who binds or obligates the Company for any debt or liability or causes the Company to act except in accordance with the provisions of this Agreement shall be liable to the Company for any such debt, liability or act.

**7.3     Indemnification**.

(a)     To the fullest extent permitted by law, a Member (herein the "Indemnifying Member") shall INDEMNIFY and DEFEND the Company and the other Member and HOLD them HARMLESS from and against all claims, losses, costs, liabilities, damages and expenses (including, without limitation, costs of suit or proceeding and attorneys' fees) they may incur by virtue of claims by third parties arising out of any action of the Indemnifying Member that could obligate or bind the Company for any debt, liability or act except as such may be incurred in accordance with the provisions of this Agreement. For the avoidance of doubt, the Members agree that the indemnification provided in the immediately preceding sentence applies only to claims by third parties.

(b)     To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions or if a judgment or other final adjudication adverse to such Covered Person establishes that the Covered Person's acts or omissions were in bad faith or involved intentional misconduct or a

knowing violation of law or that the Covered Person personally gained in fact a financial profit or other advantage to which the Covered Person is not entitled; *provided, however,* that any indemnity pursuant to this Section shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

(c)     The Company may purchase and maintain insurance, to the extent and in such amounts as the Executive Committee shall, in its sole discretion, deem reasonable, on behalf of such of the Covered Persons and other Persons as the Executive Committee shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Operating Agreement.  The Company may, with the approval of the Executive Committee, enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 7.3 hereof and containing such other procedures regarding indemnification as are appropriate.

(d)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 7.3 hereof.

## ARTICLE VIII     RESERVED

## ARTICLE IX     Dissolution and Termination.

**9.1**     **Events of Dissolution.**  Each of the following shall each be an "Event of Dissolution":

(a)     a decision by the Executive Committee to dissolve the Company;

(b)     a material breach of this Agreement (other than a breach of Article XIII) by a Member and the continuation of such breach for 30 days after the other Member has given written notice of such breach and of its election to dissolve to the breaching Member;

(c)     the expulsion, bankruptcy (which shall mean being the subject of an order for relief under Title 11 of the United States Code), or dissolution of a Member, or occurrence of any other event that terminates the continued membership of a Member in the Company;

-21-

(d)    a Change of Control of a Member, at the written election of either Member to dissolve where:

(i)    for purposes of this Section 9.1 a "Change of Control" means:

(A)    the acquisition, directly or indirectly, of 25% or more of the voting securities of a Member by any Person other than a Person who owns, directly or indirectly, 25% or more of such securities on the Effective Date, or

(B)    the ability to elect a majority of the directors of a Member by any Person other than a Person who possesses such ability on the Effective Date; and

(ii)    notwithstanding Section 9.1(d)(i) above, a public offering or distribution to existing shareholders of the securities of a Member or its Affiliates or a management buyout of all the shares of the securities of a Member shall not be deemed an Event of Dissolution;

(e)    as otherwise required by the Act, including but not limited to the entry of a decree of judicial dissolution pursuant to the Act;

## 9.2    Effect of Dissolution.

(a)    Upon the occurrence of an Event of Dissolution set forth in Section 9.1, the Executive Committee shall commence dissolution of the Company which shall continue solely for the purpose of winding up its affairs in an orderly manner, disposing of its Assets in a commercially reasonable manner consistent with obtaining the fair market value thereof, and satisfying the claims of its creditors and Members.

(b)    After the occurrence of an Event of Dissolution, the obligations of each Member to offer Transaction Opportunities to the Company shall be terminated.  The Executive Committee shall cause the Company's Assets to be disposed of as promptly as is consistent with obtaining the fair market value thereof (or limiting loss incurred with respect thereto).

(c)    The Executive Committee shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and property, and shall cause the proceeds from the liquidation of the Company's property, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)    first, to the payment and discharge of all the Company's debts and liabilities to creditors other than Members or their Affiliates;

(ii)    second, to the payment and discharge of all of the Company's debts and liabilities to Members and their Affiliates; and

(iii)     third, to the Members pro rata in accordance with their positive capital account balances, after giving effect to all contributions, distributions, and allocations for all periods.

(d)     No Member shall receive any additional compensation for any services performed pursuant to this Section 9.2. Each Member understands and agrees that by accepting the provisions of this Section 9.2 setting forth the priority of the distribution of the assets of the Company to be made upon its liquidation, such Member expressly waives any right which it, as a creditor of the Company, might otherwise have under the Act to receive distributions of assets of the Company in satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

(e)     After an Event of Dissolution, no Member or member of the Executive Committee shall take any action that is inconsistent with, or not appropriate for, winding up the Company's business and affairs.

(f)     To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Assets have been disposed of or distributed and the Company's risk management contracts satisfied or terminated.  When that has occurred, the Members shall have no further obligations under this Agreement except under Sections 13.2, 13.3 and 13.4, which shall survive dissolution and winding up of the Company.

**9.3     Filing of Articles of Cancellation**.  Upon the completion of the disposition of the Assets pursuant to Section 9.2, the Executive Committee shall (or, on the failure of the Executive Committee to act, the Member may) promptly file a Certificate of Cancellation with the office of the New Jersey Secretary of State.

**9.4     Reserve**.  Notwithstanding the provisions of Section 9.2, the Executive Committee may retain such funds as it deems necessary as a reserve for any contingent liabilities or obligations of the Company, which reserve, after the passage of a reasonable period of time, shall be distributed pursuant to Section 9.2(c).

## ARTICLE X          Accounting and Bank Accounts.

**10.1     Accounting Method**.  The books of the Company shall be kept using accrual accounting in accordance with generally accepted accounting principles.

**10.2     Books and Records**.  The books and records of the Company shall be maintained at the office of the Member which provides bookkeeping services.  Books and records shall be maintained for the longer of two years or any period required by applicable statute or regulation. In any event, the other Member, at its expense, shall have the right during ordinary business hours and upon reasonable notice to inspect and copy such books and records.

**10.3     Financial Reports.**

(a)    The Company shall cause to be prepared and delivered to the Member, financial statements of the Company in such detail and with such frequency as the Member may reasonably request, together with all information with respect to the Company necessary for the preparation of the Member's federal, state, and local income tax returns.

(b)    At the Member's request, the annual financials may be audited at the expense of the Company.

**10.4    Tax Returns and Elections**.  The Company shall cause to be prepared and timely filed all federal, state and local income tax returns or other returns or statements required by applicable law.  The Company shall claim all deductions and make such elections for federal or state income tax purposes which the Executive Committee reasonably believes will produce the most favorable tax results for the Member.

**10.5    Bank Accounts**.  All funds of the Company shall be deposited in a separate bank, money market or similar account or accounts approved by the Executive Committee and in the name of the Company.  Withdrawals therefrom shall be made only by Persons, and for purposes, authorized by the Executive Committee.

## ARTICLE XI    Representations and Warranties of Beal.

Beal represents, warrants and covenants as follows:

**11. 1**    This section has been intentionally omitted.

**11.2    Authorization and Enforceability**.  Beal has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by Beal has been duly authorized by all necessary action, including, if necessary, member approval.  This Agreement has been duly executed and delivered by Beal and this Agreement constitutes, when executed, the legal, valid and binding obligation of Beal enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**11.3    No Violation of Laws or Agreements**.  The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by Beal will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of Beal under, any provision of (A) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which Beal is a party, or (B) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Beal or the business assets or properties of Beal.

**11.4    Consents**.    No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, Beal in connection with the execution and delivery of this Agreement or the consummation by Beal of the transactions contemplated hereby.

## ARTICLE XII    Representations and Warranties of JPOW.

**12. 1    Organization, Qualification**.    JPOW is a limited liability company duly organized and validly existing under the laws of the State of New Jersey. JPOW has all requisite power and authority to carry on its business as and where presently being conducted.

**12.2    Authorization and Enforceability**.    JPOW has the full power and authority to make, execute, deliver and perform this Agreement, and the execution, delivery and performance of this Agreement by JPOW has been duly authorized by all necessary action, including, if necessary, member approval. This Agreement has been duly executed and delivered by JPOW and this Agreement constitutes, when executed, the legal, valid and binding obligation of JPOW enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally.

**12.3    No Violation of Laws or Agreements**.    The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated by this Agreement and the compliance with the terms, conditions and provisions of this Agreement by JPOW will not, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, or result in the creation of any lien upon any of the business, assets or properties of PGS under, any provision of (A) its Certificate of Formation or other company documents, or (B) any note, bond, mortgage, indenture, license, lease, contract, commitment, agreement or arrangement to which JPOW is a party, or (C) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to JPOW or the business assets or properties of JPOW.

**12.4    Consents**.    No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or authority, is required to be obtained or made, by or with respect to, JPOW in connection with the execution and delivery of this Agreement or the consummation by JPOW of the transactions contemplated hereby.

## ARTICLE XIII    Non-Disclosure.

**13.1    Company Information**.    From the date of this Agreement, the Member hereby agrees to use only on behalf of the Company and not otherwise disclose information regarding the business and finances of the Company until the later of the dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, except that the Member may disclose such confidential information of the Company at any time to:

      (a)   a regulatory or judicial authority when given under appropriate confidentiality arrangements; and

      (b)   Affiliates of the Member except those Affiliates which from time to time compete with the Company.

After the later of dissolution of the Company or the extinguishment of the Member's obligations under Section 9.2, no restrictions on disclosure or use of such Company information shall continue.

**13.2**   Intentionally Omitted

**13.3**   **Generally Available Information.**  Notwithstanding Section 13.1, the obligation of non-disclosure shall not apply to any information relating to the business and finances of the Company which is or becomes generally available to the public through no fault of any Person owing an obligation of non-disclosure or confidentiality to the Company.

**13.4**   **Breach and Recourse.**  The Member hereby acknowledges and agrees that a breach of this covenant of non-disclosure may cause immediate and irreparable injury to the Company and will authorize recourse by the Company to injunction and/or specific performance, as well as all other available legal or equitable remedies.

## ARTICLE XIV Arbitration.

**14.1**   **Resolution of Disputes by Arbitration and Selection of Arbitrators.**  Any and all good faith differences and disputes of whatsoever nature arising out of this Agreement shall be resolved and finally settled by binding arbitration.  The arbitrator shall be qualified by education, knowledge, and experience to resolve the difference or dispute.

**14.2**   **Jurisdiction of Arbitrators and Rules Applied to Arbitration.**  The jurisdiction of the arbitrator will be limited to the issue(s) referred to arbitration, and the arbitration shall be conducted pursuant to the rules of the American Arbitration Association and the substantive laws of New Jersey; provided, however, that should there be any conflict between such guidelines and the procedures set forth in this Agreement, the terms of this Agreement shall control.

**14.3**   **Enforcement.**  Enforcement of the award may be entered in any court having jurisdiction over the Members.

## ARTICLE XVI Miscellaneous Provisions.

**15.1**   **Notices.**  Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or if sent by registered or certified mail, postage and charges prepaid, return

receipt requested, or by overnight courier of national reputation or transmitted by telecopy with evidence of the telephone number to which sent. in each case addressed to the Member's and/or Company's address or telecopier number, as appropriate, which is set forth in the books and records of the Company.  Any such notice shall be deemed to be given as of the date so delivered or telecopied if delivered or telecopied during regular business hours, as of the next business day if delivered by overnight courier or delivered or telecopied after regular business hours, and if sent by mail, three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

**15.2    Governing Law.**  Except as required by the Act, this Agreement and all questions with respect to its construction, enforcement or interpretation, the rights and obligations of the parties hereto, or the formation, administration, or termination of the Company shall be governed by the laws of the State of New Jersey without regard to any conflict of law rules of general application.

**15.3    Execution of Additional Instruments**.  The Member hereby agrees to execute such documents or instruments as may be necessary to comply with applicable laws, rules, or regulations.

**15.4    Construction.**  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the neuter gender shall include the masculine and feminine genders and vice versa.

**15.5    Headings**.  The headings in this Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any of its provisions.

**15.6    Waivers**.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not constitute a waiver of any subsequent violation or of the right to so insist.

**15.7    Rights and Remedies Cumulative**   The rights and remedies provided by this Agreement are cumulative, and also are provided in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**15.8    Severability**.  Any provision of this Agreement that is invalid, illegal, or unenforceable in any jurisdiction shall be ineffective only in such jurisdiction and only to the extent of such invalidity, illegality, or unenforceability, and without rendering ineffective the remaining provisions of the Agreement in any jurisdiction.

**15.9    Successors and Assigns**.  The rights, duties and obligations of a Member under this Agreement may not be assigned without the prior written consent of the other Member which may be given or withheld in its sole discretion.  To the extent that such consent is given, each and all of the covenants, terms, provisions, and agreements contained in this Agreement shall be binding upon and inure to the benefit their successors in interest.

**15.10   No Third Party Beneficiaries**. None of the provisions of this Agreement shall be construed to be for the benefit of or enforceable by any Person other than the parties hereto and, to the extent permitted by this Agreement, their successors in interest.

**15.11   Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

**15.12   Facsimile Signatures**. A facsimile signature may serve as an original, and that the Statute of Frauds will be waived as to any claim associated with transmittal or acceptance of the facsimile signature.

**15.13   Entire Agreement**. This Agreement, including any exhibits, is the entire agreement between the parties regarding the subject matter of the formation and operation of the limited liability company. It supersedes any other representations or agreements, whether oral or written.

**IN WITNESS WHEREOF**, the parties have executed this Agreement to be effective the date first noted above.

**ERICA L. BEAL**

By: _Erica L Beal_

Date of Execution: _9/23/19_

**JINGOLI POWER, LLC**

By: _____

Name: Brian J. Gibson

Title: President

Date of Execution: _9/24/2019_

-29-